The next case today is Equal Means Equal at All v. David Ferriero, Appeal No. 20-1802. Attorney Murphy, please introduce yourself on the record and proceed with your argument. Good afternoon. May it please the Court, my name is Wendy Murphy. I'm here on behalf of the appellants with my co-counsel, Attorney Allison Shea. I'd like to request two minutes for rebuttal, please. Yes. Thank you, Your Honor. Equal justice under law. These words are inscribed on the outside of the Supreme Court, but when women see or hear these words, we know they don't apply to us. Five women a day are killed by men in this country, and disproportionately high numbers of women are raped, beaten, and abused by men every year because these words do not apply to us, including, all due respect, you, Judge Lynch. When women were excluded from the 14th Amendment's guarantee of equal protection in 1868, we immediately fought back, and after 152 years, we finally fixed the 14th Amendment when the Equal Rights Amendment was ratified by the last necessary state in January 2020. But the Archivist of the United States unlawfully blocked the effect of that ratification by refusing to publish the ERA as the 28th Amendment, and by declaring the ERA unconstitutional. Appellants sued the Archivist because his unlawful actions caused catastrophic legal injury to all women. The lower court incorrectly dismissed appellants' complaint on standing grounds. On the issue of standing, it should be noted at the outset that standing in a public law case such as this one does not require proof of particularized injury. That principle is established in FEC v. Aikens, where the Supreme Court held that widespread injury does not defeat standing. So long as concrete injury is alleged, appellants have asserted several forms of concrete injury here. First, injury to the ERA's vitality. Second, injury to appellants' protectable legal interest in the benefits of publication. And third, injury to the organizational plaintiffs. Attorney Shea will handle that issue. With regard to the ERA's vitality, appellants rely on Idaho v. Freeman, a Ninth Circuit case from 1980. This very important case is directly on point. It dealt with a constitutional challenge to the ERA, and the injury that all women suffer when the ERA's vitality is threatened. Freeman is still good law. It has never been criticized by this court or by any court, and it deserves deference, despite the fact that it is not a First Circuit case, because it's rare for courts to have an opportunity to address constitutional amendment issues. The judge below rejected Freeman on the grounds that it was an intervention standing case, but that's not entirely correct, and it really doesn't matter, because as this court said in Cotter v. City of Boston in 2000, there's only an abstract difference between the injury needed to establish intervention standing and the injury needed to establish Article III standing. Moreover, the intervener in Freeman, the National Organization for Women, was granted intervention standing and Article III standing. We know this not because of the Ninth Circuit's ruling, which is quite skimpy, but because of the Idaho District Court judge's statements after remand. We also know that Now was able to file substantive pleadings and assert petition with the United States Supreme Court after the District Court case was resolved, even though the parties themselves had not yet appealed. Now could not have done that, based solely on their status as an intervener. Appellants in this case have far more injury in this case than Now did in Freeman, because there was no actual injury in Freeman. It was a challenge to the constitutionality of the extension of the ERA's purported deadline, but no states ratified during the extension period, so injury was speculative at best. Here we have concrete injury to the vitality of the ERA, because the archivist refused to publish it and declared it invalid. With regard to injury to appellants' protectable legal interest in the benefits of publication... Can I understand something? I'm not understanding the vitality point. The way you're describing it, I'm sure you don't mean to, sounds like it's an injury to the ERA, because it undermines the vitality of it, but the injury has to be to the plaintiff. How do you get from the effect on the vitality of the ERA to an individual plaintiff being injured thereby? What the Ninth Circuit said was that women as a class, represented through the National Organization for Women as an organization, suffered injury because they have a protectable legal interest in the ERA's vitality. That's what the Ninth Circuit said. It's the only case on point, but it's an important case, and it's directly on point. Women as a class are affected by an unlawful diminution of the ERA's vitality. That's what Freeman says. With regard to injury to appellants' protectable legal interest in the benefits of publication, this is a separate form of injury from injury to the ERA's vitality, because had the archivist published the ERA, the states would have been compelled to begin the process of identifying and repairing sex discriminatory laws, policies, and programs during the two-year period in between ERA's ratification date in January 2020 and its enforceability in January 2022. States have confirmed that they have not yet begun this repair work because of the archivist's unlawful actions. This repair work injury was embraced as a basis for standing in the D.C. ERA case, Virginia v. Ferrero, a very similar case to this one. The final ruling in that case from March 2021 was recently submitted to this court by the appellee, and although the plaintiff states in that case were denied standing, five intervener states who opposed the ERA were granted standing as defendants on the grounds that if the archivist published the ERA, they and all states would be compelled to begin the process of identifying and repairing sex discriminatory laws and policies. Judge Contreras in that case ruled that the act of publication alone would create a quote, binding and novel regime, close quote, that would force states to bring their laws and programs into compliance with the ERA in anticipation of the ERA becoming enforceable in January 2022. So it bears stating the obvious, and it is axiomatic, that if publication causes legal injury to all states because it would force them to repair sex discriminatory laws, then non-publication causes injury to all women by prohibiting them from enjoying the benefits of that repair work. Further on this issue, appellants point the court to its ruling in Carson v. Macon from last year, where this court ruled in a decision written by Judge Barron that plaintiffs had standing in a case where the government erected a barrier that prohibited plaintiffs from accessing a government benefit. The same rationale applies here. The archivist's non-publication of the ERA and declaration of its invalidity Is there any, in the pleadings, is there any specific benefit traceable to the ERA's publication that any state would take that could be traced to any of these particular plaintiffs that's identified with any specificity in the complaint? Your Honor, the complaint that we filed specifically speaks to the benefits that would injure to all women upon the act of publication because the intervener states, and we cite to this in our brief and in our complaint, because the intervener defendant states in the D.C. ERA case specifically said, we need to intervene because if publication happens I understand that. The states would take action in consequence of the publication and the states would take action to get in compliance with the ERA and let's say that part of the allegation is satisfied so that that would happen. I'm asking, is there any allegation in the complaint that any of the actions that you plead would be taken by any state in consequence of publication would result in an action that could be traced to redress any present harm that any of these plaintiffs are suffering? If there's no that's fine, you might have a different theory of standing. I just want to know if that is in the complaint. Yes, Your Honor, we make a specific allegation about a particular form of repair work that would have to take place in Massachusetts, for example. Women are currently excluded from equal protection under the state hate crime law. That mistake, that discriminatory failure, if you will, would have to be repaired by Massachusetts lawmakers in the face of publication. That is alleged in our complaint. Okay, so just playing that out, if right now somebody were to challenge the state hate crime law on equal protection grounds for not including women in it, would they have standing to bring that claim? Just with no more facts than that? I'm a woman. The state hate crimes law doesn't protect women. I'm bringing equal protection challenge because it doesn't protect women. Well, there would have to be, of course, a threatened legal injury in addition to just the abstract argument about the statute being inadequate on its face. Why isn't that equally a problem here for you? Because of the unique... I'm sorry. If you're grounding the theory of standing in a change that a state would take to a state law that would inure to the benefit of the plaintiffs, and then you identify that as a change to the state hate crimes law, wouldn't there need to be some indication that that change is of some benefit to the plaintiff because they're currently threatened by a hate crime? In the absence of that pleading, how does that solve the gap that I'm identifying? Well, no, Your Honor, because the non-publication injury exists regardless of the fact that a particular person demonstrably benefits because what Judge Contreras said, and he's right about this, is that the entire regime would change. The compulsory repair work would begin even if no one benefited. That's why a state has an interest, a protectable interest, because they would be obliged to act, so they would be under compulsion to act. But for the individual women plaintiffs in this case, they don't have any obligation to act. They're complaining because they're being deprived of a benefit. And what I'm saying is in the context of the hate crimes law that we just discussed, you agreed that it wouldn't be enough to say, well, the law doesn't favor me or protect me right now. You'd have to show something more direct than that. So I'm asking why you have to similarly show that here on behalf of these plaintiffs. Well, there's a difference between would we have a cause of action and a right to sue and would it benefit women as a class. Of course, it benefits women as a class to have all discriminatory laws fixed. It doesn't matter whether they then are applied in a real world situation. You know, the point from what Judge Contreras said about the importance of the regime change is that every state would fix its explicit discriminatory laws and policies to declare that their laws now protect all women equally. Whether or not any woman then experiences a particular injury or advantage from that is irrelevant. The benefit to women is the equality. It is the equal treatment expressed in law. Not having equality is the harm. Having the government establish equality in its laws and policies is the benefit. And it's a very different question than whether a particular woman has a cause of action because she isn't currently experiencing the unequal protection of any particular law. The benefit is the government's expression of full equality in the language of all of its laws and all of its policies. Maybe I'll just clarify one more point. If it is an injury to the states that they must repair sex discriminatory laws and policies, how can it not be a per se legal benefit to the class of people who stand to gain from that repair work? How can that not be a legally protectable interest? That's exactly what women are asking for in this case. Equal protection. Counsel, why don't you take 30 seconds to wrap up and we'll see if there are additional questions. Yes, Your Honor. I simply should emphasize that the importance of Judge Contreras' ruling cannot be overstated because there really is no other case that expressly recognizes this kind of injury and benefit. The idea that a state should be compelled by the act of publication on the part of the archivist regardless of validation. That's a vital piece here because publication doesn't create validation. The ERA doesn't become valid by publication, but it does have legal effect because of exactly what Judge Contreras said. Women as a class are entitled to the benefit of the repair work that they are not today getting because of the archivist's unlawful actions. Thank you, Ms. Murphy. We'll hear from Ms. Shea. Good afternoon, Your Honors. May it please the Court, Allison Shea for the appellants. In addition to the injuries identified by Attorney Murphy, Appellant Equal Means Equal has also suffered organizational injuries under Havens. Under Havens, an organization is injured for standing purposes when it suffers a frustration of mission or diversion of resources. Proof of either is sufficient, but EME has established injury under both. EME has had to divert resources and their mission has been frustrated because they've had to identify and counteract the archivist's unlawful actions through educational campaigns and advocacy, including the filing of this lawsuit. The lower court incorrectly cited the Boston Children's case from 2002 for the proposition that appellants suffered no injury because they have only, quote-unquote, a mere interest in the ERA and have only contributed, quote-unquote, mere advocacy to the cause. Equal Means Equal has done far more than mere advocacy and clearly has more than a mere interest in the ERA. Indeed, Equal Means Equal was formed specifically for the purpose of establishing the ERA as the 20th Amendment to the Constitution. EME has been solely devoted to the ERA since 2009, and it was instrumental in ensuring its ratification in Nevada, Illinois, and Virginia. This unparalleled commitment to the ERA cannot reasonably be characterized as a mere interest, nor are their activities limited to mere advocacy. To the contrary, a significant amount of their work is educational, which is why they made an educational film in 2016 to help people understand the ERA. EME's efforts to educate its members, the general public, and state officials about the Archivist's unlawful actions satisfies Haven's diversion of resources prong and accords with African communities, a case from the District of Massachusetts from 2019. In that case, the court found a diversion of resources injury simply because the organizational plaintiff had to expend resources educating the public about harm that might be caused if the government followed through with threatened inaction. The Grahl case from the District Court of Rhode Island in 2015 stands for the same proposition. Could you go back a step? What's the case you just cited? Yes, Your Honor. That case is African Communities v. Trump. Okay. The Grahl case from the District Court of Rhode Island in 2015 stands for the same proposition. The court there found that injury was established because the organization diverted its resources to identify wrongful government action and to educate the public about the government's culpability. These are the same diversion of resources injuries that EME has suffered. Notably, the court in Grahl found injury even though the organization proved only that it might have to expend resources to educate the public about the possibility of future unlawful government action. Here, EME has had to expend resources to educate the public about unlawful government action that has already happened. EME's mission has also been frustrated by the archivist's actions and inactions because EME's mission is to inform, educate, and help establish the ERA as the 28th Amendment, and the archivist's actions and inactions have impeded this mission. In support of our position, appellants again rely on Grahl, where the court found that EME's misconduct constituted a frustration of mission injury. Rather than relying on Grahl in African communities, Judge Casper cited cases outside of the circuit that are not controlling or on point, such as the fair elections case from the Sixth Circuit, and then concluded that educating people about the unlawful nature of the archivist's actions caused no injury to EME because education is no different than mere advocacy or advising others on how to comport with the law. This is incorrect. The plaintiffs in African communities were a similar organization, much like EME, who were advocates that also provided education and information to its members and the general public. When the government threatened an action they believed was unlawful and would hurt the people and the interests they represented, they turned their education and advocacy efforts away from what they had been doing in order to address the government's threatened unlawful action. What was the action in African communities? The action in African communities was that the Trump administration had said that they weren't going to renew the DED, which would provide deportation protection specifically for members of the African communities. I think it was Liberia was one of the main ones, and so the court found there that that threat of not having that deportation protection in place could potentially cause harm to the members of their group and the interests they represented. So anyways, your honors, the plaintiffs in African communities were a similar organization, much like EME, who were advocates that also provided education and information to its members and the general public. The individuals would have had standing in African communities. That's a bit of a difference here. You're extrapolating from a case in which individuals would have had standing that says, well, in that case, the organization also had standing. You're now pausing a case in which I understand how if the individuals have standing, you'd say it's just like African communities. Suppose the individuals don't have standing. Your honor, it sounds as if you're making an argument that the organization independently could have standing even if the individuals don't. I don't quite see how African communities helps you with that, given that the individuals there would have had standing. Your honor, just to clarify, in African communities, and especially in Graal too, there was an organizational injury to the organization and to the individual plaintiffs. Here, the organizational injury to African communities was the fact that the organization had to educate the public and its members about what could happen. I understand that. What I'm saying is in African communities, there was no question that the individuals would have been injured by the action at issue because they would be subject to deportation. There's a separate question, well, does the organization have any interest in this? The court concludes, yes. I understand that if the individual women plaintiffs here have standing, African communities could help you in saying so too should the organization. I understood you to be also arguing to us that even if the individual women do not have standing because they have no concrete or particular injury, nonetheless, the organization has standing because of the diversion of resources. Yes, exactly, your honor. African communities doesn't have facts that support that conclusion because the individuals there did have standing. What authority do you have that an organization could have standing based on this diversion of resources in a situation in which no individual would have been harmed? Yes, your honor, I see what you're asking. I would actually point the court to Grawl in that case. Similar to your point, there were individualized plaintiffs there as well, but the court made it a point to point out that the organization itself had suffered harm. It was the Rhode Island Commission of Human Rights. Because they had to educate the public about the culpable conduct of the defendant, which in that case was discriminatory housing policies, the organization itself suffered because they had to distribute that education and inform the people about the conduct, which is exactly what EME has to do. Counsel, I'm surprised you're relying on a district court case from Rhode Island that appears to be distinguishable. I thought your best argument for associational standing, even if individuals do not have standing, was the Havens case. That's your primary argument. Havens was a diversion of resources away from the primary mission of the organization. Your opponent here says there was no diversion away from the primary mission of your organization. If anything, there was an intensification of effort by the in furtherance of the primary mission. That is not standing alone enough to give associational standing in the absence of individualized standing. What is your response to that, please? Yes, Your Honor, of course. I completely agree with your argument that Havens is the controlling law here. I'm not making an argument, I'm just asking a question. With your statement, Your Honor. With your point. I would like to clarify that I do disagree with Brother Counsel here because the education point that EME has been distributing prior to the archivist actions and inactions, Equal Means Equal was focused solely on educating the public about the ERA and its mission was to solidify it as the 28th Amendment of the Constitution. After and only because of the archivist actions and inactions, EME has completely had to change that mission to focus on educating the public about the culpability of the archivist. I understand that that's a fine line, Your Honor, but I think the real question is to ask, what is the education about? Here, the education is now about the archivist and government procedure, which I can assure you were never part of EME's mission and quite frankly something that I'm sure they would prefer not to get into. Thank you, Your Honor. With regard to associational standing and the requirement that a member of the organization must have individual standing, I respectfully refer the Court back to Attorney Murphy's argument on behalf of all women. Could I just ask you one last question, just on Havens, just so I get the point. In what sense, even in Havens, the law being challenged, the thing being challenged there would give rise to standing for some people other than the organization. But I think what I'm a little puzzled by here is that the only actor that's been identified if we assume the individual women plaintiffs don't have standing to actually, is it the idea that because the states would have standing then the association, even though the association here is so disconnected from the states, maybe that is enough to get you there. I understand, Your Honor. And I think to that end, I would refer you back to Attorney Murphy's argument about the Freeman case and how women as a class and individually have an interest in the vitality of the case. If we didn't accept that argument, just assume we don't accept that argument, maybe we will, but just assume, even if we don't, how can you get, is there an argument that, well, because the states would be in a position to challenge the archivist, then this association, which has a mission bearing no connection to the interests of the states, nonetheless, that makes it possible to say, well, since there is some actual injury here for someone, some association should be able to independently have standing if it would affect their mission. I'm just trying to bridge that gap. Sure, I think I understand your question, Your Honor. To that end, I would say, just as Judge Contreras said, had the archivist published the 20th Amendment as the Constitution requires, then the states would have been burdened and the benefit would be to women, so here to restrict that, it's that benefit to women as a class, so I think that that separates it a little bit from the state. The state would have the burden and the women would have the benefit, and the injury here is the barrier to that benefit. Let me re-ask the question in terms of my memory of Havens. Potentially, there were individuals who had standing, and potentially they could be members of the association. Your association has no states as members, nor would it be common to think of states as being part of membership organizations. I had thought the questions were going to why should states be considered the potential equivalent of individuals who can be members of your association. States seem to be entirely different entities than individuals. I do think I'm understanding your question, Your Honor, and please stop me if I'm not, but here the difference between the states and the individuals, again, is that the states would bear the burden and they would be forced to review and revise their discriminatory laws that were deemed... We've heard all of that, thank you. It was well presented. That's not the issue. The issue is that associational standing itself a kind of murky concept in our Supreme Court case law, which I've dealt with a few times, seems to have components of the standing of members and potential members as well as injury to the association itself. But in none of those cases were states considered to be the equivalent of individual people who were or could have been potential members of the association. This isn't about injury to the states. This is about why standing law would accept states as filling the need for some individualized injury. Your Honor, I'd like to respectfully defer your question to my co-counsel, if that's appropriate. She has rebuttal time. She can deal with it then. In terms of then, Your Honor, if I could just add one thing. In terms of the states suffering the injury, I would refer the Court to the 106B argument about the states having the benefit of being able to participate fully in the ratification process. And so I would call that the injury here. And that same injury, I think, could be reflective to the individuals here as well, because the states acting on behalf of the people that they represent would want that participation rightfully in the Constitution. Thank you, Ms. Hurff. Just to be clear, no state is a plaintiff on your side in this case? That's correct, Your Honor. Thank you. If you would mute your devices, Mr. Pullum. Good afternoon, and may it please the Court. Thomas Pullum for the Archivist of the United States. Article III requires a plaintiff to establish three elements to demonstrate standing. Injury in fact, causation, and redressability. I'll start on injury in fact, because that's where the panel focused its questions earlier. And it's the first and foremost of these three elements. At this stage in the proceedings, the plaintiffs must allege an invasion of a legally protected interest that is concrete and particularized and actual or imminent. The plaintiffs don't do that here. Instead, they rely on the kind of abstract social interest. For example, an interest in the validity of the ERA, or an interest in the correction of... That's not entirely true with respect to the organizational claim. Because there, they're talking about resource diversion. So could you just address that piece of it? I'm happy to. I think the first point is a point that the Supreme Court made in Havens, which is that the analysis for an organization is the same as the analysis for an individual. You still have to have a legally protected interest and meet the concrete, not abstract, etc. requirements. The plaintiff's counsel here I think misdescribed what Havens requires and what was at issue there. The reason why there was standing in Havens was because there was... The statute at issue provided a statutory right to information. That information was denied to the organization. And that denial of accurate information or rather the provision of misinformation interfered with the organization's activities in identifying available housing and providing referral services. Havens did not and nor do any of the Court of Appeals decisions who have considered this. None of these cases embrace the idea that when an advocacy organization suffers a setback to the success of its advocacy efforts, that that provides Article III standing. Indeed, that would allow anyone, organization or individual to challenge any government action. They could say, well, I want the government to do X. The government hasn't done X. I think it's maybe slightly different when the action being challenged is an action, if taken, would be understood to compel action by others. That's, I guess, what they're suggesting. If the district court in the D.C. case was correct, then the publication would trigger obligations on the states that gives the states standing to address the issue. In a case like that, where the legal thing being challenged would have that consequence for others, that might give an organization standing. I'm not saying that's right, but could you just address that piece of it? I think really what they're discussing is a generally available grievance about the proper application of the law. The Supreme Court has been very clear, including in Lujan, that that does not state an Article III case or controversy. With respect to the D.C. District Court decision, I just want to be clear we provided that decision in a 28-J letter. The District Court held that states did not have standing there. It permitted some states to intervene as defendants, but there was not a ruling that states had standing to pursue that. I think this gets back to the argument I was making before about really what plaintiffs are asserting is just a generalized interest in having the law be applied correctly, and they turn around and then they say they educate others about the proper application of the law. Could you just address the African communities case also? I apologize, I don't know the facts of that case. I tried to look it up just now, it's not available on Westlaw, and I wasn't able to get over to Lexis quickly enough. But I think this is settled by the binding Supreme Court precedent and other Court of Appeals cases that I believe are far more instructive and on point. It sounded from the description of the African communities case that it was different because there were members that had standing. That's not actually an element of what's typically called an organizational standing case. That's part of associational standing. But organizational standing doesn't depend on any one member having standing. It's an injury to the organization itself. Just to be clear, you're drawing a distinction between associational standing, which is what I was talking about, and organizational standing, which you say is what is involved here. As to the organizational standing, you say that it doesn't fit within havens, even if the states, if the archivist took the steps, even if the states then had to take steps, that that doesn't give the organization any particularized or concrete injury that with others. Is that the argument? That's correct. One point of clarification. The plaintiffs did, at least with respect to one of the plaintiffs, did argue for associational standing. He said they didn't meet that because they haven't identified any members in their complaint. So they failed for that reason. But yes, with respect to the organizational standing, the organization must have an injury to itself. The reason why diversion of resources was mentioned in havens was that was a manifestation of the injury to the organization. As the D.C. Circuit has explained in some of its cases on this line, including Fair Employment Council, if the defendant's actions don't harm the organization's interest, then any kind of reallocation of benefits is just a voluntary choice. I understood you to also be drawing a distinction based on, in havens, there being a statute, an indication of congressional intent to sort of recognize injury from a statutory violation and that is not what we have here. Yes, the Supreme Court did talk about that in its kind of general discussion of the statute around pages 373. It didn't refer again to that in the organizational section, but this is all against the background of the statute at issue. And the Supreme Court specifically distinguished the Sierra Club decision in its analysis of organizational standing. And of course, Sierra Club is the case that says an abstract interest in an issue is not sufficient injury for Article III purposes. Now in that case, I mean, Sierra Club was certainly interested in the land use actions and no doubt talked about it, but that's exactly what an abstract interest is. And that's why harms to kind of advocacy and these public education campaigns don't amount to a cognizable injury. Can I just understand whether you were also making an argument to us that's more tethered to the particular legal action that they're suing to have occur here, which is the publication by the archivist and how that bears on the standing issues? That's correct. And this was in fact the ground of the D.C. District Court's decision, why there was no standing for the states. The District Court there cited the same cases we do. This is a Supreme Court's decision in Dillon v. Gloss, which distinguished between then it was the Secretary of State certification of an amendment and the actual adoption of the amendment and the D.C. Circuit's decision in Colby, which said that a plaintiff has no right to a lawsuit that just challenges the Secretary's certification because it wouldn't affect anything. And the District Court in D.C. said because the archivist's publication of an amendment does not affect the amendment's validity, plaintiffs cannot show that his refusal to publish the ERA caused the injury they claim. And we've made the same argument under the rubric of regressibility, but it can also be viewed as a causation aspect as well. It may be that we don't have to address that here, but if we go with your other arguments, but just so I understand that argument, is it of any significance to the inquiry how the publication might affect real world understandings of whether it's part of the Constitution and how it might affect the federal government's own treatment of it? I don't think so. I mean, I think the Why wouldn't the real world affect the publication as opposed to just the formal legal point that it could be valid even if it wasn't published? Why wouldn't that have any bearing on the standing? Actors would treat it quite differently if it were published compared to if it weren't. So it may have some kind of practical effects, but it wouldn't make the ERA valid, and the plaintiff's claimed injury is that the ERA is not valid, and the certification alone doesn't do that. The certification kind of collects the state's ratification actions and then publishes the amendment, but we read Dillon and the DC Circuit's decision in Colby to specifically distinguish between the certification and the effectiveness of an amendment, and this loops back then to some issues that the court raised earlier, that even if some of the states had to change laws, that wouldn't create standing for individuals or organizations that just have a generalized interest in what they view as the proper application of the law. So if there are no further questions, we ask that the judgment be affirmed. All right. Thank you, Mr. Pullum. Ms. Murphy? Thank you, Your Honor. Several points in response to my brother's argument. First of all, because validation of an amendment occurs when the last necessary state ratifies, the ERA is valid today. Under Article V, 38 states have ratified, and the ERA is valid, except for the fact that the archivist interrupted and interfered with that validity by his actions, his unlawful actions. That is a barrier, and that is a barrier that under Carson v. Macon from this court last year gives all women standing. An erection of a barrier in response to a legal benefit to which a person is entitled creates standing, and if publication of the ERA causes the states, compels the states to begin the repair work, then the beneficiaries of that repair work have to have standing when that compulsory act does not occur because of an unlawful action of the archivist. It really is that simple. Under Carson v. Macon, interference, the barrier to that benefit to which all women are entitled creates standing. Quite separate from the analysis under Havens. All women stand to benefit from the repair work that should now be underway and would now be underway, but for the archivist's interference with the ratification of the ERA in January of 2020. States are not doing that repair work because of the archivist. If women don't have standing to challenge that, who does? I mean, that really is the critical question here, and the states certainly don't have standing under the parents-patriarch rule. Women have standing because they are entitled to the benefits, the government benefits of that repair work, just as Judge Contreras said. I'd like to just make a couple of closing remarks if I can. The government has said that you should uphold the lower court's order and dismiss this case on standing grounds. I can cite 170 million reasons why you should not do that. Women make up half the population in this country, and every single one of us has been injured by the archivist. An executive branch official, a librarian who unlawfully refused to do his mandatory non-discretionary duty to publish the ERA, and without authority, he also declared the ERA unconstitutional. At a minimum, his actions should be subject to judicial review because determining constitutionality is a judicial branch function, not an executive branch function, and judicial review is impossible if this court rules that appellants have no standing. This court should reach the merits, too, because this is one of the most important women's rights cases in the history of this country. Nothing matters more than constitutional equality because all women's rights rise or fall based on whether women can expect equal protection of those rights when they seek to enforce them. This court should validate the ERA on behalf of all women, which of course includes women who are gay, Jewish, Asian, black, transgender, and so on. Current 14th Amendment jurisprudence not only segregates and subjugates women compared to other classes of people, it forces women to view themselves through a hierarchical prism such that some parts of who they are are well protected by the law, while their femaleness is not. This is an unconscionable affront to core American values and it belies the Supreme Court's inscribed promise of equal justice under law. This court has an historic opportunity to end the hypocrisy and endow all people in this country once and for all with the dignity of basic human equality. Appellants respectfully request that this court reverse the lower court order, rule in favor of appellants on the merits, order the archivist to publish the ERA, and declare the ERA the 28th Amendment to the United States Constitution. Thank you. Any additional questions? No. Thank you, Counsel. Thank you, Your Honor. That concludes argument in this case. Attorney Murphy, Attorney Shea, and Attorney Pullum, you should disconnect from the hearing at this time.